**UNION CARBIDE CORPORATION, Appellant,**

v.

**Delfa MAYFIELD, Appellee.**

**No. 13–99–778–CV.**

Court of Appeals of Texas, Corpus Christi.

Aug. 31, 2001.

Rehearing Overruled Nov. 1, 2001.

---

Barbara L. Johnson, David W. Strickler, Wickliff & Hall, Houston, Luther H. Soules, III, Soules & Wallace, San Antonio, Anthony J. Sadberry, Cypress, Robinson C. Ramsey, Attorney At Law, San Antonio, Ronald B. Walker, Walker, Keeling & Carroll, Victoria, for Appellant.

Cynthia T. Sheppard, Attorney At Law, Cuero, John W. Griffin, Jr., Houston, Marek & Griffin, Victoria, for Appellee.

Before DORSEY, RODRIGUEZ, and SEERDEN [1], JJ.

**OPINION**

DORSEY, Justice.

Union Carbide Corporation appeals from a judgment, following a jury verdict, awarding Delfa Mayfield damages for his suit for discrimination under the Texas Commission on Human Rights Act (the TCHRA).[2] Carbide appeals by ten issues. We reverse and render.

### I. Factual Background

For his entire life Delfa Mayfield suffered from extreme pes planus or flat-footedness in both feet. This condition caused him chronic intermittent foot pain. He served as a combat medic in the U.S. Army but was honorably discharged because of his flat feet. Afterwards he became a paramedic and worked for the Victoria and Refugio EMS Departments. Working as a paramedic required him to stand on his feet, carry people up and down stairs, and climb some stairs and ladders. Climbing caused him sporadic pain, but the pain never kept him from doing his job, and he successfully climbed all the stairs and ladders that he had to climb.

He also worked for Brown & Root as a safety coordinator. At this job he climbed stairs and ladders, which caused him "on-and-off" pain. However the pain did not prevent him from doing a good job, and no one at Brown & Root ever indicated they had a problem with his work because of his foot condition.

About 1990, Mayfield went to work for Union Carbide as a rigger. On May 14, 1991, Dr. Lisch, a podiatrist, operated on Mayfield's right foot. In a letter[3] dated May 29, 1991, Dr. Lisch stated that

> Because of his lack of arch support he can not comfortably bear weight for any prolonged period of time and requires a job that is both sitting and standing. Any job with prolonged standing or climbing will only result in a possible rupture or irritation of the tendons that hold the arch up.

Although the surgery was successful Mayfield continues to have pain in his feet

---

1. Senior Justice Robert J. Seerden assigned to this court by the Chief Justice of the Supreme Court of Texas pursuant to Tex. Gov't Code Ann. § 74.003 (Vernon 1998).

2. See Tex. Labor Code Ann. § 21.001–.556 (Vernon 1996 & Supp.2001).

3. This letter was kept in Mayfield's medical file at Carbide.

from time to time. After the surgery Dr. Crabtree, Carbide's company doctor, restricted him from climbing ladders and stairs. These restrictions kept him from effectively doing his rigger's job, and Carbide terminated him in January, 1992.

After his termination Mayfield sued Carbide in federal court. The parties settled the suit on terms that required Carbide to reinstate Mayfield as an operator. In connection with his reinstatement Carbide required him to provide a letter from his doctor, releasing him to work as an operator. On May 1, 1995, Dr. Wilcox wrote a letter in which he released Mayfield "to full duty with no restrictions."

On May 25, 1995, Mayfield saw Dr. Cranston, Carbide's plant physician, for a pre-employment physical. Mayfield gave him the work release and a medical history which showed that he had foot pains. Also he told Dr. Cranston about his flat feet. Dr. Cranston testified that Mayfield's case of pes planus was probably the most extreme he had ever seen. However he did not think that he needed any work restrictions due, in part, to Dr. Wilcox's release.

As an operator Mayfield was frequently on his feet and had to climb stairs and ladders. His feet sometimes hurt when he was on the job. The longer he spent on a ladder, the more his feet would hurt. Mayfield testified, though, that his feet never kept him from doing his operator's job. His supervisor, John Schmidt, gave him favorable evaluations and did not recall Mayfield complaining about having sore feet. Schmidt also did not recall Mayfield having any problems doing his job.

In addition to working as an operator Mayfield was a member of Carbide's emergency response squad at the plant. In connection with this activity, on July 8, 1996, he saw Dr. Cranston for an EMT physical.[4] At this time he told Dr. Cranston that he had pain in his right foot. Dr. Cranston told him to return if "things got worse." After the physical Dr. Cranston still rated Mayfield as "Class A," meaning that he qualified to do any job at the plant.

On July 29, 1996, Mayfield returned to Dr. Cranston. Mayfield's testimony was that he returned on Dr. Cranston's request and that his feet had not gotten any worse. Dr. Cranston testified that Mayfield returned, complaining that his foot pain was worse because of stair and ladder climbing. According to Dr. Cranston, Mayfield's right foot was "quite swollen." Dr. Cranston wrote in his medical notes that Mayfield had "foot pain aggravated by ladder and stair climbing" and put him on "indefinite restrictions of no ladder or frequent stair climbing. . . ." He sent Mayfield to Dr. Reilly, a podiatrist, for an independent medical examination. Dr. Cranston testified that "Dr. Reilly confirmed that his foot was grossly swollen, very tender to the touch." Dr. Cranston also testified that Dr. Reilly recommended that Mayfield should not climb ladders or stairs anymore.

On August 7, 1996, Dr. Cranston met with Mayfield to discuss Dr. Reilly's findings. At this time Dr. Cranston issued permanent work restrictions for Mayfield of no climbing of ladders or scaffolds and no frequent stair climbing. Regarding this meeting, Dr. Cranston wrote in his notes that:

> Discussed employee's options. He's not interested in pursuing ankle arthroscopy. His foot feels much better since he has been on restrictions. He agreed

---

4. Dr. Cranston explained that when a person is in an emergency response position, EMT, or fire fighter, the person has to get an annual physical to see if the person qualifies to stay in as an EMT or a fire fighter.

ladder climbing is not in his best interest, and we agreed that will probably always be the case even if he had any further surgery. Examined foot today. It shows minimal swelling and no discomfort. Current restrictions of no ladder or scaffold work and no frequent stair climbing written.

Dr. Cranston had two main reasons for issuing the permanent restrictions. First he relied on Dr. Reilly's recommendation that Mayfield avoid ladder and stair climbing. Second he relied on Dr. Lisch's May 29, 1991 letter [5] which stated that "Any job with prolonged standing or climbing will only result in a possible rupture or irritation of the tendons that hold the arch up." Dr. Cranston shared Dr. Lisch's concern. Dr. Cranston was conerned that Mayfield may do irreparable damage to the tendons, and that he might fall and hurt himself or someone else.

On August 14, 1996, Dr. Cranston received a letter from Mayfield, asking Dr. Cranston to lift the restrictions. He also stated that "Dr. Reilly, ... says my pain can be fixed by arthroscopy. I am able to climb stairs and to climb ladders. Due to my foot pain, especially my right ankle, I have discomfort. But I still can do my job as shown by my evaluation."

On September 4, 1996, Mayfield and Dr. Cranston discussed the letter. Dr. Cranston testified that he told Mayfield that he "could not ethically put him in harm's way by removing the restrictions" but "advised him that it was his right to pursue the ankle arthroscopy if he wanted to." Dr. Cranston also testified that "if we continued to let him do the climbing that he was doing that he would be going into harm's way and do irreparable damage to his foot."

After Carbide put restrictions on Mayfield he went to truck-driving school. As of September 27, 1996, he had finished truck driving school and received a certificate.

The restrictions kept Mayfield from doing his operator's job. Accordingly in October, 1996, Carbide removed him from this job (which paid about $18 per hour) and offered him a safety clerk's job (which paid about $12 per hour). He refused the job because he wanted to work as an operator, and he did not like the reduced pay. Upon refusing the clerk's job Carbide terminated him. After losing his operator's job Mayfield went to work as a paramedic, and he also worked as a truck driver.

## II. THE LITIGATION

Mayfield sued Carbide for wrongful discharge on the basis of disability under the TCHRA. He contended that: (1) Carbide erroneously regarded him as disabled in the major life activity of working by removing him from his operator's job; (2) Carbide's restrictions on Mayfield constituted a record of an impairment that substantially limited his major life activity of working; and (3) Carbide regarded him as having a physical impairment that substantially limited his major life activity of working. The jury awarded him $100,964.58 in compensatory damages and $50,000 in punitive damages. The trial court then awarded him $490,211.41 as lost future wages and benefits, and $275,725.11 for attorneys' fees and costs.

## III. THE TCHRA

The TCHRA prevents an employer from discharging or discriminating against an employee based upon "disability," which is

---

**5.** Dr. Cranston had access to Mayfield's medical records from the time that Mayfield worked for Carbide as a rigger.

defined to mean "a mental or physical impairment that *substantially limits at least one major life activity* of that individual, a record of such an impairment, or being regarded as having such an impairment." Tex. Lab.Code Ann. § 21.002(6) (Vernon Supp.2001) (emphasis added); *Azubuike v. Fiesta Mart, Inc.,* 970 S.W.2d 60, 63 (Tex.App.—Houston [14th Dist.] 1998, no pet.).

■ To set up a *prima facie* case of discrimination a plaintiff must make a threshold showing that he has a disability. *Garcia v. Allen,* 28 S.W.3d 587, 596 (Tex. App.—Corpus Christi 2000, pet. denied). An individual can be classified as disabled under any one of the three definitions of the term contained in the Act. *Id.* Under the statute, a person is defined as disabled if he either (1) is actually disabled, (2) is regarded as being disabled, or (3) has a record of being disabled. Tex. Lab.Code Ann. § 21.002(6). For all three, the word "disabled" is defined the same—*i.e.,* having a mental or physical impairment that substantially limits at least one major life activity. *Id.*

■ A "major life activity" is considered akin to "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* at 596. *Hartis v. Mason & Hanger Corp.,* 7 S.W.3d 700, 703 (Tex. App.—Amarillo 1999, no pet.) (quoting 29 C.F.R. § 1630.2(i)). The Code of Federal Regulations provides the example of: "A diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication." 29 C.F.R. § 1630.2(j). Mayfield contends that his flat-footedness is such a disability. We disagree.

The Texas Supreme Court has stated that a disability as contemplated by the TCHRA "must be one which is generally perceived as severely limiting [plaintiff] in performing work-related functions in general." *Chevron Corp. v. Redmon,* 745 S.W.2d 314, 318 (Tex.1987). The *Redmon* Court further stated:

> An examination of the entire Act in the Human Resources Code reveals that the legislature was concerned with those physical and mental defects which are serious enough to affect a person's use of public facilities and common carriers, ability to obtain housing, and the ability to cross the street. The intent of the Act was to protect those impaired to the point that they might not be able to participate in the social or economic life of the state, achieve independence, or become gainfully employed, without this protection. The legislature obviously was not concerned with minor physical or mental defect.

*Id.* at 317.

■ In determining if a person is substantially limited in a major life activity we consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment. *Garcia,* 28 S.W.3d at 596; *Norwood v. Litwin Engineers & Constructors, Inc.,* 962 S.W.2d 220, 224 (Tex.App.—Houston [1st Dist.] 1998, pet. denied) (quoting 29 C.F.R. § 1630.2(j)(2) (1995)). Mayfield's position is that the life activities he is substantially limited from performing are climbing ladders and frequent stair climbing. Whether an activity qualifies as a major life activity has been determined on a case-by-case basis. *Garcia,* 28 S.W.3d at 598.

The federal district court for the Southern District of New York held that climbing stairs qualified as a "major life activity." *See Nodelman v. Gruner & Jahr*

*USA Publishing,* No. 98 Civ. 1231(LMM), 2000 WL 502858 (S.D.N.Y. April 26, 2000) at *7. In our case Dr. Cranston restricted Mayfield from climbing ladders, scaffolds, and *frequent* stair climbing. He testified that " 'frequent' in this case meant that no repetitive, over and over and over again." His testimony was that the intent of the restriction was to prevent repetitive stair climbing. He did not want Mayfield going up and down stairs all day long. Mayfield could still climb stairs to go to and from his job and take his breaks.

The United States Supreme Court has offered some guidance in interpreting this provision. It stated that:

> "Major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 1 CFR § 457.103. When referring to the major life activity of working, the Equal Employment Opportunity Commission (EEOC) defines "substantially limits" as: "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." § 29 CFR 1630.2(j)(3)(i) (1998). The EEOC further identifies several factors that courts should consider when determining whether an individual is substantially limited in the major life activity of working, including "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within [the] geographical area [reasonably accessible to the individual], from which the individual is also disqualified." § 1630.2(j)(3)(ii)(B). Thus, to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job. See § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does not

constitute a substantial limitation in the major life activity of working").

*Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2142, 144 L.Ed.2d 450 (1999).

## IV. ANALYSIS

### 1. *Dr. Carl Hansen's Testimony.*

■ Before addressing the merits of this case we must first discuss Carbide's sixth issue asserting that the trial court erred in not excluding the testimony of Mayfield's expert, Dr. Carl Hansen. The trial court held a hearing to determine the admissibility of the testimony, and afterwards, ruled that he could testify.

### A. APPLICABLE LAW

A trial court's admission of expert testimony is reviewed by this Court under an abuse of discretion standard. *K–Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex.2000). This Court will only overturn a trial court's decision to admit such evidence upon finding that the trial court's ruling is arbitrary, unreasonable or without reference to any guiding rules or legal principles. *Id.* We find no abuse of discretion in the trial court's admission of Dr. Hansen's testimony.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of opinion or otherwise. Tex.R. Evid. 702. Otherwise admissible opinion testimony is not objectionable because it embraces an ultimate issue of fact. Tex.R. Evid. 704.

■ A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testi-

mony must be relevant and be based on a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995). The trial court makes the initial determination about whether the expert and the proffered testimony meet these requirements. *Id.* The trial court has broad discretion to determine admissibility, and we will reverse only if there is an abuse of that discretion. *Id.* at 558.

In deciding if an expert is qualified trial courts "must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 719 (Tex.1998) (quoting *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996)). To gauge reliability the *Gammill* Court explained:

> *Daubert [v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)]* and Rule 702 demand that the district court evaluate the methods, analysis, and principles relied upon in reaching the opinion. The court should ensure that the opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of the discipline.

*Id.* at 725–26 (quotations omitted). In *Robinson* the supreme court identified six nonexclusive factors to determine whether an expert's testimony is reliable and thus admissible. *Robinson,* 923 S.W.2d at 557. But in *Gammill* the court recognized that the *Robinson* factors may not apply to certain testimony. *Gammill,* 972 S.W.2d at 726. In those instances, there still must be some basis for the opinion offered to show its reliability, and, ultimately, the trial court must determine how to assess reliability. *Gammill,* 972 S.W.2d at 726. If an expert relies upon unreliable founda-

tional data, any opinion drawn from that data is likewise unreliable. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997). Further an expert's testimony is unreliable even when the underlying data is sound if the expert's methodology is flawed. *Id.*

**B. ANALYSIS**

Dr. Hansen had master's and doctorate degrees in vocational rehabilitation counseling. He worked in the field as a rehabilitation counselor and then worked twenty-six years as a professor at the University of Texas training rehabilitation counselors. After retiring from UT he worked in private practice where he counseled disabled persons. He also placed persons with medical restrictions in jobs in geographic areas. Regarding this case he was asked to look at Mayfield's restrictions in relationship to his education, training, and transferability of skills within his industry and a broad range of jobs. To do this Dr. Hansen had to (1) consider whether Carbide's restrictions would cause Mayfield to have problems in the labor market if the restrictions were applied broadly outside of his current or past employer, (2) look at a "class of jobs" or a "broad range of jobs in various classes" and compare them to an average person having the same kind of training, skills, and abilities, and (3) consider the geographical area where Mayfield resided or could find employment.

In performing his analysis Dr. Hansen considered three factors: (1) Mayfield's age, education, and work history; (2) the geographic area in which Mayfield would reasonably find employment; and (3) Carbide's restrictions upon Mayfield's physical capacity to perform work within an industry similar to the one he had worked in within this geographical area. Mayfield's geographical area, known as the Golden

Crescent, included Calhoun, DeWitt, Goliad, Jackson, Lavaca and Victoria Counties. Dr. Hansen looked at the employers who normally would hire a person with Mayfield's skills. He also considered Mayfield's two principal skills, operator and emergency medical technician (EMT). Dr. Hansen determined the number and types of jobs in the Golden Crescent by using information from the Texas Workforce Commission. He stated that the U.S. Department of Labor had conducted studies to analyze the various jobs that exist in the nation. This information is published in the Dictionary of Occupational Titles. He used this dictionary, along with a computer program called "Life Step," to determine if Mayfield's abilities would fit within certain jobs, or if he could transfer into other jobs.

### 1. CLASS OF JOBS

Dr. Hansen used Carbide's information to determine the percentage of jobs that Mayfield could do at its Seadrift plant (the plant where Mayfield had worked). The plant had 971 employees and 674 of these jobs required "some stair or ladder climbing." Thus the restrictions excluded Mayfield from 69.5 percent (674 out of 971) of the jobs at the plant.

Dr. Hansen also determined the percentage of jobs available to Mayfield outside the Seadrift plant. In doing so he looked at the number of jobs existing in the Golden Crescent. This area had sixteen employers with nine plants producing chemicals, plastics, and aluminum. These plants had 7,323 workers. Dr. Hansen applied the formula of 69.5 percent of lost jobs to the 7,323 figure. Thus Mayfield would have a loss of 5,089 jobs out of the 7,323 jobs.

### 2. BROAD RANGE OF JOBS.

Dr. Hansen said that "broad range of jobs" means those jobs which Mayfield could transfer his skills as an operator and EMT. For this purpose Dr. Hansen used the Life Step program to analyze the Department of Labor information to find that Mayfield's skills would transfer into 41 other kinds of jobs all of which demanded that the worker perform light or medium type of work and not sedentary work. Dr. Hansen interpreted Mayfield's restrictions to mean that he could only do sedentary work.

Dr. Hansen verified his methodology. He considered a number of reports that had been written by other people who had the same training and background doing the same type of analysis that he did. He reviewed their methodology and determined that it was the same as his.

On cross-examination Dr. Hansen said that he had no evidence that other companies would place the same restrictions on Mayfield. He only had evidence of what the perception would mean in the labor market. He was asked to determine what jobs are precluded on the basis of Carbide's perception of Mayfield's limitations and relation to the work site and then apply it to all work sites. He had never before performed this type of analysis, but he had used the Dictionary of Occupational Titles and Department of Labor information to analyze jobs.

To determine whether Dr. Hansen is a qualified expert, the question is whether he has scientific, technical, or other specialized knowledge that would assist the jury to understand this evidence. *See* Tex.R. Evid. 702. We conclude that Dr. Hansen's knowledge would aid the jury in understanding the evidence. Accordingly we conclude that the trial court did not abuse its discretion in finding Dr. Hansen qualified to testify. His testimony is reliable because he stated the basis and methodology behind his opinion. Dr. Hansen's experience, coupled with his thorough tes-

timony about the methodology he used, demonstrate that the opinions he drew from the underlying data are reliable. *See Gammill*, 972 S.W.2d at 726. Thus, we conclude that the trial court did not abuse its discretion by admitting Dr. Hansen's testimony. We overrule the sixth issue.

*Dr. Hansen's Testimony Before the Jury*

During the trial of this case Dr. Hansen testified that he applied the restrictions found in Plaintiff's Exhibit 32. This document shows restrictions of "no ladder or scaffold work [and] *no frequent* stair-climbing." (emphasis added). Carbide issued these restrictions on August 7, 1996, which was the date Dr. Cranston issued the permanent restrictions. Dr. Hansen testified, however, that the restrictions he actually used for his analysis were "*no stair climbing,* no ladders, no scaffolding work." (emphasis added). His understanding, based upon the records he relied upon, was that the director of the Seadrift plant and the other officials "signed off that no ladder climbing and no stair climbing would be involved for [Mayfield]."

Dr. Hansen said that the restrictions eliminated from consideration Mayfield's class of jobs; *i.e.*, jobs that a person has learned through on-the-job training, experience, and skill and jobs that are closely related. Mayfield's class of jobs included operator, EMT, and about forty-one other jobs. Dr. Hansen said that "[t]hose jobs all call for light-to-medium-type activities. When we take away a person's ability to climb, to use ladders, to use stairs, he's basically in a sedentary occupation; and

that's what I considered that he had been reduced to, sedentary work."

Dr. Hansen stated that "range of jobs" included jobs that a person could potentially engage in and not necessarily jobs based on training or experience. In determining the effect of the restrictions Dr. Hansen considered their effect within Carbide's Seadrift plant. Carbide's information showed that as of October, 1996 (the time Carbide terminated Mayfield), the Seadrift plant had 971 employees and that 674 of these jobs required "some stair and ladder climbing." Dr. Hansen did not know the extent of the stair or ladder climbing involved in the 674 jobs. Nevertheless his testimony was that based upon the restrictions Mayfield was prevented from performing about sixty-nine to seventy percent of the jobs (674 out of 971) at the Seadrift plant, because these jobs required some ladder or stair climbing. This constituted the range of jobs available at the Seadrift plant. He concluded that the restrictions forced Mayfield into sedentary work.[6]

On cross-examination counsel questioned Dr. Hansen about his testimony concerning the plant management's prohibition against any stair or ladder climbing for Mayfield. When counsel asked him what he was referring to, Dr. Hansen said that he was referring to an earlier exhibit. This exhibit, Exhibit 30, is an injury/illness classification routing form. The form shows restrictions of "No stair or ladder climbing."[7] These restrictions were issued on July 29, 1996. Carbide's plant

---

**6.** Dr. Hansen stated that the Golden Crescent area is heavily oriented toward the chemical, aluminum, and plastic industries. He said that "[w]hen you start to eliminate stair climbing and ladder climbing, you have reduced the opportunities to basically sedentary jobs; meaning that somebody needs to be in a job where they don't move much. They just

sit at a desk or do something like that.... If you take stairs and ladders away, you've eliminated a good portion of his ability to earn an income."

**7.** Dr. Cranston testified that this "no stair or ladder climbing" restriction was a clerical error.

manager signed the form on July 30, 1996, about a week *before* Dr. Cranston issued the permanent restrictions of no ladder climbing or *frequent* stair climbing.

Dr. Hansen admitted that when he performed his analysis he did not consider the fact that Mayfield had a license to drive a truck. He never interviewed Mayfield about his current skills. He said that he "was only asked to give what [Mayfield's] work history would tell us and the impact the medical restrictions would have on his work history." Carbide's counsel questioned Dr. Hansen about a document prepared by Carbide's human resources department. This document listed Mayfield's restrictions as "no ladder or scaffold work, no frequent stair climbing." Carbide used this document to determine if their were job openings in its plant for Mayfield. Dr. Hansen concluded that the restrictions forced Mayfield into sedentary work "because when he was restricted from ladder and stair climbing in his usual and customary occupations, it restricted him then, in the eyes of his employer, to sedentary work." His conclusion about how Carbide perceived Mayfield was not based on interviews with Carbide's personnel, including Dr. Cranston. When asked if he knew whether anyone outside of Carbide would know about the restrictions he said, "that's up to the company, how they pursue and evaluate." He did not know whether another company would agree or disagree with the restrictions.

### 2. *Impairment Substantially Limiting Major Life Activity*

By issue one Carbide asserts that the trial court erred in failing to find as a matter of law that Mayfield was not "regarded as" disabled. Question one of the charge asked the jury "Did Union Carbide remove Delfa Mayfield from his operator position because it regarded him as having

a physical impairment that substantially limited him in the major life activity of working?" The jury answered affirmatively. Carbide argues that Mayfield's flat-footedness does not qualify as a "disability" as defined in the TCHRA, and therefore, he is not protected under the Act as a matter of law.

As earlier stated "disability" means "a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having such an impairment." Tex. Lab.Code Ann. § 21.002(6) (Vernon Supp.2001). A case similar to the one before us is *Garcia v. Allen*, 28 S.W.3d 587 (Tex.App.—Corpus Christi 2000, pet. denied). In that case Hoechst Celanese hired Roel Garcia to work as a technician. Garcia had no left kneecap, and Celanese knew this when it hired him. In 1997, Garcia had surgery on his knee, and his doctor placed him on permanent restrictions that prohibited him from climbing ladders, squatting, kneeling, and crawling. Celanese terminated him after that surgery. After his termination Garcia sued Celanese for disability discrimination under the TCHRA. The trial court granted summary judgment in favor of Celanese.

We affirmed the summary judgment, holding that Garcia's knee injury did not substantially limit a major life activity, and was thus, not covered by the TCHRA. We based our holding on the following reasoning:

While loss of a kneecap is a serious impediment, we do not believe it rises to the level of the type of "disability" contemplated by the anti-discrimination act. *Crawling, squatting, climbing ladders and kneeling are not the same type of "major life activities" as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking,*

*breathing, learning, and working. See Sutton,* 119 S.Ct. at 2139 (citing 1 CFR § 457.103).

Even if working in general is the major life activity that Garcia points to as being substantially limited, we do not believe that his restrictions rise to the level of significantly reducing his ability to work in a class of jobs or a broad range of jobs as compared to the average person having comparable training, skills and abilities. *When the activity is "working," the individual's impairment substantially limits the activity when the impairment severely restricts or forecloses his ability to work in general.* 29 C.F.R. § 1630.2(j)(3)(i); *Redmon,* 745 S.W.2d at 318; *Azubuike,* 970 S.W.2d at 63–64; *Chandler v. City of Dallas,* 2 F.3d 1385, 1391–93 (5th Cir. 1993), *cert. denied,* 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994). In other words, it is not enough that the employee asserting a disability cannot perform a single or particular job or a narrow range of jobs. *Azubuike,* 970 S.W.2d at 63–64. As the Supreme Court pointed out in *Sutton,* [C]reating physical criteria for a job, without more, does not violate the ADA. The ADA allows employers to prefer some physical attributes over others, so long as those attributes do not rise to the level of substantially limiting impairments. An employer is free to decide that physical characteristics or medical conditions that are not impairments are preferable to others, just as it is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job. *Sutton,* 119 S.Ct at 2142–43.

*Garcia,* 28 S.W.3d at 599–600 (emphasis added).

We believe the reasoning in *Garcia* applies to this case. We do not find that Mayfield's flat-footedness is the type of disability the TCHRA was intended to address. The inability to perform frequent stair climbing or climbing of ladders and scaffolds does not significantly restrict Mayfield in his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. *See Sutton,* 119 S.Ct. at 2142. Mayfield's flat-footedness does not severely restrict or foreclose his ability to work in general. Dr. Hansen based his analysis on no stair climbing rather than no *frequent* stair climbing. He did not know if other employers would agree with Carbide's restrictions, and he did not interview other employers to determine how they would treat Mayfield's flat-footedness. He also did not take into account that Mayfield had received a commercial driver's license and that he had worked as a truck driver after Carbide terminated him. Dr. Hansen's analysis did not show that Mayfield could not work in general. *See Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).[8]

Further Mayfield testified that he held jobs as a safety coordinator, a paramedic, and a truck driver. He is not prevented from holding positions similar to those because of his foot condition. He also testified that he declined to accept a

---

8. In *Sutton,* the Court stated "It is not enough to say that if the physical criteria of a single employer were imputed to all similar employers one would be regarded as substantially limited in the major life activity of working only as a result of this imputation. An otherwise valid job requirement, such as a height requirement, does not become invalid simply because it would limit a person's employment opportunities in a substantial way if it were adopted by a substantial number of employers." *Id.* at 493–94, 119 S.Ct. 2139.

job as a safety clerk at Union Carbide because of the inferior pay scale. This is indirect proof that his foot condition does not render him incapable of performing this type of position as well. The mere fact that Mayfield is no longer qualified to perform a job with superior pay does not create a right of action under the TCHRA.

 Moreover, frequent stair climbing and climbing of ladders and scaffolds are not the kind of major life activities that were envisioned by the Act. Certainly, Mayfield's foot condition is not serious enough to affect his use of public facilities and common carriers, his ability to obtain housing, or his ability to cross the street. *See Redmon,* 745 S.W.2d at 318. While true that Mayfield is restricted in the range of jobs he can perform by his unfortunate physical limitations, he is not impaired to the point that he "might not be able to participate in the social or economic life of the state, achieve independence, or become gainfully employed," without the protection of the TCHRA. *See id.* We believe this is the type of "minor physical or mental defect" that falls outside the scope of the Act. *See Garcia,* 28 S.W.3d at 599–600; *see also Deas v. River West, L.P.,* 152 F.3d 471, 481–82 (5th Cir.1998) (hospital employee's termination due to two minor seizures and employer's unwillingness to employ her anywhere in the hospital held not sufficient to cover a broad class of jobs). We sustain the first issue.

### 3. *"Disability" Under the Other Two Statutory Definitions*

By issue two Carbide assets that the trial court erred in failing to find as a matter of law that it did not maintain a "record of" disability with regard to Mayfield. By issue three Carbide asserts that there was no evidence, or alternatively insufficient evidence, to support the jury's

finding that Mayfield was "regarded as" disabled, or had a "record of" disability. Question two asked the jury, "Was Delfa Mayfield removed from his operator position because Union Carbide misclassified or maintained a record of an impairment that substantially limited him in the major life activity of working?" The jury answered affirmatively

### A. *Record of Impairment*

 To prevail on a "record of disability" claim a plaintiff must show that he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *See Deppe v. United Airlines,* 217 F.3d 1262, 1267 (9th Cir.2000). In order to constitute a disability under the TCHRA the impairment must be "a mental or physical impairment that substantially limits at least one major life activity" of the individual. *See* Tex. Lab. Code Ann. § 21.002(6) (Vernon Supp.2001). Because we have already held that as a matter of law Mayfield's foot condition does not amount to such an impairment, regardless of whether he contends that he had a record of having the impairment, this impairment does not amount to a disability as defined in the Act. *See Garcia,* 28 S.W.3d at 599–600. The evidence does not establish that Mayfield has a record of an impairment that substantially limited him from working in a broad class of jobs or a broad range of jobs.

### B. *Regarded as Having an Impairment*

 An employee is regarded as having a substantially limiting impairment if his employer mistakenly believes that (1) he has a physical impairment that substantially limits one or more major life activities, or (2) an actual, non-limiting impairment substantially limits one or more major life activities. *See Sutton,* 119 S.Ct.

at 2149–50. In both instances a covered entity must entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. *Id.* at 2150.

Mayfield attempts to prove that Carbide regarded him as disabled through its refusal to approve him for working as an operator due to his foot condition. In *Deas v. River West, L.P.*, 152 F.3d 471 (5th Cir.1998) plaintiff, a hospital technician with epilepsy, had two minor seizures at work. Her employer fired her due to her seizures and told her there were no jobs for her in the entire hospital. She sued, alleging her employer regarded her as having an impairment because the employer's assertion there were no other jobs she could work in at the hospital proved they perceived her to be substantially limited in her ability to work in any clinic or hospital setting, including work as a housekeeper, secretary, groundskeeper, and a diverse assortment of other jobs. *Id.* at 480–81. The Fifth Circuit disagreed, holding that the evidence presented did not warrant the inference her employer regarded her as being unable to work in a broad class of jobs. *Id.* at 481. Rather the evidence merely showed that her employer regarded her as unable to work in any but a few highly specialized jobs that required relatively high levels of vigilance or uninterrupted awareness. *Id.* at 481–82.

Here while Carbide's restrictions show that it perceived Mayfield as being unable to work at jobs requiring ladder climbing or frequent stair climbing because of his foot condition we do not view Carbide's restrictions as indicative that it perceived Mayfield as being unable to work to such an extent that would substantially limit a major life activity. We cannot conclude that Carbide regarded Mayfield as being unable to work in a broad class of jobs or a broad range of jobs in various classes. There is undisputed evidence which shows that Carbide attempted to place Mayfield in a safety clerk's job for which it did not deem him disqualified due to his foot condition. This evidence shows that Carbide believed Mayfield to be qualified for other positions. *See Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998). Further Dr. Hansen's testimony showed that even with a restriction of no ladder climbing and no stair climbing Mayfield could still do thirty percent of the jobs at the Seadrift plant. Thus we hold that Carbide did not regard Mayfield as disabled. We sustain issues two and three.

Due to our disposition of the above issues we need not address Carbide's remaining issues. *See* Tex.R.App. P. 47.1.

We REVERSE the trial court's judgment and RENDER that Delfa Mayfield take nothing by his suit against Union Carbide Corporation.