TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-04-00196-CV






Nathan Bush, Appellant


v.


Coleman Powermate, Inc. and Tecumseh Products Company, Appellees







FROM THE DISTRICT COURT OF SAN SABA COUNTY, 33RD JUDICIAL DISTRICT

NO. 7871, HONORABLE GUILFORD L. JONES, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N




 Nathan Bush was injured by a fire that erupted while he was refueling a generator
manufactured by Coleman Powermate, Inc., and powered by a Tecumseh Products Company motor. 
He asserted negligence and products liability claims against both Coleman and Tecumseh. The
district court granted appellees' motions to exclude four of Bush's expert witnesses and granted
summary judgment in favor of appellees on all claims. Bush appeals the exclusion of his expert
witnesses and the summary judgment against his marketing defect claims under negligence and strict
products liability theories. We affirm the judgment.


BACKGROUND


 This background section is derived from the depositions and other documents filed
in this case, as well as live testimony taken at the Robinson hearing. See E.I. du Pont de Nemours
v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995).

 At the time of the fire, Bush was constructing his home with tools powered by a
Coleman generator equipped with a Tecumseh gasoline engine. While he was using a skill saw, the
generator ran out of gas. The generator was just outside the back door. Bush checked the oil and
removed the gas cap, then walked around the house to his truck to get a gas can. He also picked up
a gallon jug of water, took a drink, and poured water over himself to cool down.

 Bush testified that he did not know how much time elapsed after the generator ran
out of gas before he attempted to refuel it. He and Tecumseh's attorney had this exchange:


Q. How much time elapsed from when the generator ran out of gas and you
actually started pouring fuel in it? In other words, was that a 30-second
period of time, walk to the truck and back--


A. Oh, no.


Q. --or was it five minutes because you were messing around doing
something else?


A. Yeah. It was--I don't have an exact time. Long enough for me to check
the oil and walk to my truck and get a drink of water. I mean, I didn't--I
was in no hurry. It was pretty hot.



Bush returned to the generator, rechecked the oil, replaced the oil cap, and began refueling. He
testified that he did not spill any gasoline. As he bent over to monitor the level of gas, Bush heard
a "woof" noise and dropped the gas can, splashing gasoline on himself. His face and neck caught
fire. With some difficulty, he extinguished the flames on his body and sought help.

 The generator Bush used was purchased at a pawn shop by Bush's stepfather for
Bush's brother. It did not come to Bush in a manufacturer's box, and he was unsure whether it was
accompanied by an owner's manual. Bush previously had used this generator without mechanical
problems or fire, and had used other generators while in the military. 

 In June 2000, Bush sued Coleman and Tecumseh, alleging design and marketing
defect claims under strict products liability and negligence theories. Appellees filed motions to
exclude testimony by Bush's experts Lori Hasselbring, Joe Fowler, Waymon Johnston, Judd
Clayton, and Paul Beaver. Hasselbring and Fowler were to testify about the auto-ignition of
gasoline. Johnston was to testify about the need for a warning on the generator to wait two minutes
after shutting it down before refueling. Clayton was to testify about the likely source of ignition. 
Beaver, the fire marshal, was to testify about his investigation of the fire. Appellees alleged that
these witnesses were not qualified to give opinions as to design defects, dangers associated with
refueling a hot generator, or causation. Appellees also claimed that Hasselbring and Fowler's
opinions were based on flawed reasoning and methodology and that the underlying facts did not
provide an adequate basis for their opinions.

 Appellees filed traditional and no-evidence motions for summary judgment as to all
claims. These motions challenged the evidence Bush had adduced on design and marketing defects
and his ability to prove causation. Bush defended the negligence and marketing defect claims; he
expressly did not contest judgment against his design and manufacturing defect claims.

 At the Robinson hearing, held after the agreed discovery deadline passed, appellees'
witnesses criticized Bush's expert witnesses' reliance on estimates of the closed-container auto-ignition temperature of gasoline in concluding that the generator had been hot enough to ignite
gasoline vapors when Bush refueled it. Appellees' expert Dwight Pfennig (1) testified that the facts
of this case required application of the auto-ignition temperature for open-air conditions, which is
about 360 degrees Fahrenheit (360ºF) higher than the closed-container temperature.

 The district court stated at the hearing that it would exclude testimony from four of
Bush's witnesses. (2) Subsequently, the district court sent the parties an e-mail "order/ruling of the
court" that was "to be reduced to a formal order." The court found that the "fit" of the science to the
facts of the case was fatally flawed because Bush's experts' failed to consider the open-air auto-ignition temperature of gasoline. The court also noted that Bush's experts had failed to get gasoline
to auto-ignite during their tests. The court further found no evidence of causation in the record as
a matter of law. It concluded that failing to attach a warning to the generator recommending a two-minute waiting period between turning the generator off and refueling, as Bush advocated, could not
have caused the fire because (1) Bush "clearly waited at least two minutes" before refueling the
generator, and (2) regardless of the wait, "open-air auto-ignition of this type of engine/generator has
been proven to be all but impossible even without a cooling off period." The court granted summary
judgment to appellees on all claims without specifying whether it relied on traditional or no-evidence
grounds for summary judgment.

 The court subsequently signed separate orders granting summary judgment to
Coleman and Tecumseh on (1) the contested design and manufacturing defect claims, and (2) all
remaining claims. The court did not elaborate on the basis for its rulings.

 Bush filed a motion for new trial and to reconsider the exclusion of his experts. Bush
also asked the court to consider reports submitted by two expert witnesses on December 31, 2003,
after the court's rulings. This motion was overruled by operation of law, and this appeal ensued.


DISCUSSION


 Bush appeals the district court's exclusion of his expert witnesses and granting of the 
summary judgment as to his marketing defect claims.


Exclusion of experts

 We review the district court's exclusion of expert testimony for an abuse of
discretion. See Robinson, 923 S.W.2d at 558. We determine whether the trial court acted arbitrarily,
unreasonably, or without reference to any guiding rules or principles. See Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). The test is not whether, "in the opinion of
the reviewing court, the facts present an appropriate case for the trial court's action." Id. at 241. We
cannot conclude that a trial court abused its discretion merely because we would have ruled
differently. See id. at 242. The trial court enjoys wide latitude in determining the admissibility of
expert testimony. Wolfson v. Bic Corp., 95 S.W.3d 527, 532 (Tex. App.--Houston [1st Dist.] 2002,
pet. denied).

 Texas Rule of Evidence 702 permits a witness qualified as an expert by knowledge,
skill, experience, training, or education to testify on scientific, technical, or other specialized subjects
if the testimony would assist the trier of fact in understanding the evidence or determining a fact
issue. Tex. R. Evid. 702. The party offering the expert's testimony bears the burden to prove that
the witness is qualified under Rule 702. Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713,
718-19 (Tex. 1998) (trial courts must "ensure that those who purport to be experts truly have
expertise concerning the actual subject about which they are offering an opinion"). In addition to
showing that the witness is an expert, the proponent must show that the expert's testimony is
relevant to the issues in the case and is based upon a reliable foundation. Robinson, 923 S.W.2d at
556; see Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993). 

 To be relevant, the proposed expert testimony must be "sufficiently tied to the facts
of the case that it will aid the jury in resolving a factual dispute." Robinson, 923 S.W.2d at 556. 
Evidence that bears no relationship to the issues of the case is irrelevant and does not satisfy Rule
702's requirement that the testimony be of assistance to the jury. Id.

 To be reliable, the expert's method must be grounded in the methods and procedures
of science and the opinion must be more than subjective belief or unsupported speculation. See id.
at 557. If an expert relies on unreliable foundational data, any opinion drawn from that data is
unreliable. Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 714 (Tex. 1997); Union Carbide
Corp. v. Mayfield, 66 S.W.3d 354, 362 (Tex. App.Corpus Christi 2001, pet. denied). Even when
based on sound data, an expert's testimony is unreliable if the expert's methodology is flawed. 
Havner, 953 S.W.2d at 714. The trial court must decide only whether the analysis used to reach the
conclusions is reliable, not whether the expert's conclusions are correct. Perez v. Blue Cross Blue
Shield of Tex., Inc., 127 S.W.3d 826, 830 (Tex. App.Austin 2003, pet. denied).

 The Robinson opinion provides a non-exclusive list of factors a trial court may
consider in making the threshold admissibility determination under Rule 702; these include: (1) the
extent to which the expert's theory has been or can be tested, (2) the extent to which the technique
relies upon the subjective interpretation of the expert, (3) whether the theory has been subjected to
peer review and/or other publication, (4) the technique's potential rate of error, (5) whether the
underlying theory or technique has been generally accepted as valid by the relevant scientific
community, and (6) the non-judicial uses which have been made of the theory or technique. 
Robinson, 923 S.W.2d at 557; see Volkswagen of Am., Inc. v. Ramirez, No. 02-0557, 2004 WL
3019227, at *4 (Tex. 2004).

 We will begin by considering together the exclusion of testimony from Hasselbring
and Fowler because they filed a joint report and because their report underlies the other experts'
testimony. We will then separately consider the exclusion of testimony from Johnston and Clayton. 


 Hasselbring and Fowler

 Hasselbring and Fowler are both licensed professional engineers. Hasselbring holds
a bachelor's degree in paper science and engineering and master's and doctoral degrees in chemical
engineering. She has many years of experience in the petrochemical industry with an emphasis on
plastics production, processing, and commercial applications. She has performed failure analysis
and accident documentation and investigation, particularly in the chemical and petrochemical
industries. Fowler holds a bachelor's, master's, and doctoral degrees in mechanical engineering. 
Fowler has consulted with more than two hundred companies regarding the mechanical design of
process plant equipment, development of pipeline design criteria and operating procedures, fire
safety of mechanical and consumer product equipment, fatigue design, finite element analysis, strain
gauge testing, drilling and production equipment design and operation, failure analysis, and general
mechanical engineering testing and design.

 In their joint report, Hasselbring and Fowler stated that, in order for gasoline to auto-ignite during refueling of a generator, gasoline vapors must contact some part of the generator that
is heated at or above the closed-container auto-ignition temperature of gasoline, which they
identified as being between 635ºF and 853ºF. Variables they identified that affect auto-ignition
include vapor concentration, ambient temperature, wind speed, winter versus summer blends of
gasoline, regular unleaded gasoline versus premium unleaded gasoline, gasoline additives, amount
of gasoline poured, elevation of the can, whether gasoline has been spilled, and the exact sequence
of events leading to a particular incident. Hasselbring and Fowler concluded that it is difficult to
determine specific combinations of these variables that may lead to the auto-ignition of gasoline
during refueling.

 Hasselbring and Fowler conducted a series of tests to determine if Bush's generator
had reached the closed-container auto-ignition temperature of gasoline. They placed an exemplar
Coleman generator in the corner of a firebox with the firebox doors left open. They measured
surface temperature near the muffler exhaust, which they found was the hottest contact surface on
the generator. Hasselbring and Fowler ran two different series of tests: "load tests" measuring the
temperature of the generator when used to power a device, and "fire tests" in which they spilled
gasoline on the generator.

 During the load tests, the generator rarely reached the minimum temperature threshold
Hasselbring and Folwer identified for the closed-container auto-ignition of gasoline. The muffler
temperature stayed near 600ºF with no load (594ºF in one test, 603ºF in the second), and fluctuated
between 378ºF to 644ºF with loads. Within two minutes after the generator was shut off, the muffler
temperature dropped to 441ºF. 

 During the fire tests, Hasselbring and Fowler were not able to get gasoline to auto-ignite. Using regular gasoline with no load on the generator, the muffler reached a constant
temperature of 558ºF and 585ºF in two tests. When they spilled 20 milliliters of gasoline onto the
muffler, no ignition occurred; Bush's experts conceded that they were not surprised by this
development because the muffler temperature was below the 635ºF temperature minimum they had
identified for closed-container auto-ignition of gasoline. Nor did ignition occur when they ran the 
generator on premium unleaded gasoline, which raised the generator's maximum temperature. The
muffler temperature reached 693ºF and 612ºF with no load, and 734ºF when a 150-watt load was
added to the generator. (3) Within two minutes after the generator was shut off, the muffler
temperature dropped to 495ºF to 500ºF. Once again, gasoline spilled on the motor did not ignite
during any of the tests, even when the temperature was within the auto-ignition range for closed
containers, although white smoke twice emanated from the rotor and from underneath the bottom
of the generator.

 Hasselbring and Fowler offered conclusions that (1) there were insufficient warnings
in operating manuals and on the generator and engine regarding possible auto-ignition of gasoline
during refueling and contact with hot surfaces, and (2) both Coleman and Tecumseh were negligent
in not testing the generator and engine to determine the possibility of auto-ignition of gasoline during
refueling.

 We conclude that the court acted reasonably in excluding these witnesses because
they were not shown to be experts in the relevant field and because their opinions do not satisfy
Robinson. Although having expertise in other areas, Hasselbring had not performed any work on
a generator before this case. She testified that she had no expertise or specialized knowledge with
respect to internal-combustion engines, generators, product warnings or the origins and causes of
fire. Fowler admitted that he had no expertise or specialized knowledge with respect to product
warnings. Nor did Hasselbring and Fowler satisfy the first Robinson requirement that their theories
on causation have been or can be proven through other scientifically valid testing. To the contrary,
Hasselbring and Fowler failed to start a fire by dripping gasoline on a hot generator when testing
their theory. (4)

 The conclusions drawn by Hasselbring and Fowler also do not satisfy the second
Robinson factor because they are based on subjective interpretation, as the experts produced no
objective evidence--and only unsuccessful tests--to support their theory of causation. Nor did they
show that their theory is supported by other tests or studies, has been subjected to peer review or
publication, is generally accepted as valid by the relevant scientific community, or has been used in
non-judicial settings. See Volkswagen, 2004 WL 3019227, at *5.

 Under these circumstances, the potential rate of error with respect to the conclusions
and opinions of Hasselbring and Fowler is high, and the gap between the theory and the facts of this
case is too large. They were unable to obtain ignition even when pouring gasoline on the hot
generator immediately after it stopped running (in contrast to the delay of uncertain duration in this
case). The court could have concluded that their use of the auto-ignition temperature of gasoline for
closed-containers was improper given that the generator was outside the back door in this case; use
of the open-air temperature would require the generator to reach a temperature far above any
achieved in Bush's expert's tests. There is a gap between the facts of this case and Hasselbring and
Fowler's theory and tests because the latter are predicated on conditions that Bush himself denied
existed. The district court did not abuse its discretion by excluding the testimony of Hasselbring and
Fowler as unreliable. See Volkswagen, 2004 WL 3019227, at *5.


 Johnston

 Johnston, a licensed professional engineer and certified safety professional, holds a
bachelor's degree in mechanical engineering and a master's and doctoral degree in industrial
engineering. He taught human factors, product safety, and industrial safety engineering for 24 years
at Texas A&M University. He has over ten years of industrial experience and has been involved in
safety engineering and accident prevention activities in the military and the petroleum and aerospace
industries.

 Johnston concluded that Coleman and Tecumseh knew or should have known that:
(1) individuals occasionally would spill gasoline while refueling hot generator engines, (2) a fire
could occur as a result, (3) serious injuries could occur from such a fire, (4) the warnings in their
owner's manuals were inadequate with respect to these dangers, and (5) the generator and engine
were defective and unreasonably dangerous with respect to the dangers associated with refueling a
hot engine. He testified, however, that "I'm not giving any opinions about causation." In forming
his opinion, Johnston relied on his review of materials furnished to him (including the report by
Hasselbring and Fowler), his training, and his years of experience; he did not conduct any tests
himself to determine what specific dangers were possible.

 Johnston testified that the generator should have borne a warning to wait two minutes
after the generator stopped before refueling. He said that a two-minute warning is not perfect, but
would have been adequate. Johnston explained that he used a two-minute period based on
Hasselbring's data on how fast the engine cooled. He added that he had assumed that the two-minute
period must have been based on test results because later models of engines manufactured by
Tecumseh and others carried warnings that users should allow the generator to cool two minutes
before refueling. Johnston admitted that he had only the data in Hasselbring's report and deposition
and the two-minute warning on comparable engines.

 The district court did not abuse its discretion by finding Johnston's testimony
unreliable. Johnston depended on Hasselbring and Fowler's report, which we have determined was
properly excluded. He performed no testing or analysis to determine the scientific significance of
the two-minute period. Johnston failed to satisfy the Robinson factors concerning objective, external
support for his theory. See Robinson, 923 S.W.2d at 557. He also relied on underlying facts
squarely rejected by Bush's uncontroverted testimony that he did not spill gasoline and that he had
waited before refueling the generator. Because there is no evidence regarding the scientific
significance of the two-minute period for the warning, the court did not abuse its discretion by
excluding Johnston's opinion regarding its efficacy. See Volkswagen, 2004 WL 3019227, at *5.


 Clayton

 Clayton, who has a bachelor of science degree in electrical engineering, claims
expertise regarding electrical product failures, electrocutions, fires, and explosions. Clayton was
hired by Bush to evaluate the sources of ignition and determine which was the most probable. 
Clayton said that he has never been involved in a case or testing in which a fire was caused by a
generator that was not running at the time of ignition. He did not perform any tests based on the
facts in this case and did not review other testing in this case. 

 Clayton said the ignition source was most probably the heat from the generator's
exhaust system. In his report, he excluded all potential sources of ignition of the gasoline vapors
except for the generator. He concluded that a defective condition of the generator, which allowed
for ignition of gasoline, was a direct producing cause of this incident and Bush's injuries.

 Clayton's testimony is predicated on underlying facts contrary to Bush's testimony
and the evidence of the temperature the generator reached in testing. Clayton stated that he was hired
only to address the cause of the fire in terms of what available source of ignition existed. He
conceded that a generator in the off position would have to be excluded as a potential ignition source
if its surface temperature was lower than the auto-ignition temperature. With the exclusion of
Hasselbring and Fowler's evidence, there is no evidence that the generator reached any recognized,
applicable auto-ignition temperature; further, auto-ignition never occurred in any of their
experiments. The court did not abuse its discretion by deciding that Clayton's testimony regarding
a hypothetical generator that did reach the auto-ignition temperature would not help the jury.

 We conclude that the district court did not abuse its discretion by determining that
Bush failed to show the relevance and reliability of these experts' testimony.


Summary judgment

 On appeal, only Bush's claims for strict products liability marketing defect,
negligence, and gross negligence remain. Bush argues (1) that Coleman and Tecumseh failed to
present evidence to rebut the presumption that Bush would have heeded a warning had one been
provided, (2) that the district court committed error by making a factual conclusion that Bush waited
in excess of two minutes before refueling the generator, and (3) that the district court ignored
evidence from Tecumseh and Coleman personnel as to the necessity of the "cool-down" period
before refueling.


 Rebuttable presumption

 Bush contends that the district court erred by ignoring the rebuttable presumption
regarding product warnings discussed in Magro v. Ragsdale Brothers, Inc., 721 S.W.2d 832 (Tex.
1987). Once a plaintiff proves that the lack of adequate warnings or instructions rendered a product
unreasonably dangerous, a rebuttable presumption arises that the user would have read and heeded
such warnings and instructions. Id. at 834. Bush, however, offered no evidence that a cool-down
period is necessary before refueling or that the lack of a warning rendered the generator and engine
unreasonably dangerous. Without such evidence, the rebuttable presumption of Magro did not arise.


 Factual determination

 Bush also alleges that the district court improperly made a factual determination
regarding how much time passed before Bush refueled the generator. In its e-mail "order" granting
summary judgment, the district court stated that Bush clearly waited at least two minutes before
refueling and that, regardless of the wait, auto-ignition of gasoline on this occasion was proven to
be all but impossible, even without a cooling-off period.

 The finding in the e-mail "order" is not binding. It is not the formal order granting
summary judgment to which we must look for the court's reasons for ruling. See Sharpe v. Roman
Catholic Diocese of Dallas, 97 S.W.3d 791, 796 (Tex. App.--Dallas 2003, pet. denied); Strather
v. Dolgencorp of Tex., Inc., 96 S.W.3d 420, 426 (Tex. App.Texarkana 2002, no pet.); see also
Cherokee Water Co. v. Gregg County Appraisal Dist., 801 S.W.2d 872, 878 (Tex. 1990). Further,
we cannot consider any finding of fact made in a summary-judgment context. See IKB Indus.
(Nigeria) Ltd. v. Pro-Line Corp., 938 S.W.2d 440, 441 (Tex. 1997).


 Merits of the summary judgment

 As the district court's order did not specify whether it granted summary judgment on
traditional or no-evidence grounds, we must affirm summary judgment if any of the summary
judgment grounds are meritorious. Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211,
216 (Tex. 2003). We review the district court's grant of summary judgment de novo. Joe v. Two
Thirty Nine Joint Venture, 145 S.W.3d 150, 156 (Tex. 2004).

 The standard for reviewing a motion for traditional summary judgment is well
established: (1) the movant for summary judgment has the burden of showing that there is no
genuine issue of material fact and that it is entitled to judgment as a matter of law, (2) in deciding
whether there is a disputed material fact issue precluding summary judgment, we will take evidence
favorable to the non-movant as true, and (3) we will indulge every reasonable inference in favor of
the non-movant and resolve any doubts in its favor. See Tex. R. Civ. P. 166a(c); Nixon v. Mr. Prop.
Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985); Trilogy Software, Inc. v. Callidus Software, Inc.,
143 S.W.3d 452, 458 (Tex. App.Austin 2004, pet. filed). A defendant is entitled to summary
judgment under Rule 166a(c) if it conclusively negates at least one of the essential elements of the
plaintiff's cause of action or conclusively proves each element of its affirmative defense, thereby
showing that it is entitled to judgment as a matter of law because no genuine issue of material fact
remains. Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 222-23 (Tex. 1999).

 Under the no-evidence summary-judgment rule, a party may move for summary
judgment if, after adequate time for discovery, there is no evidence of one or more essential elements
of a claim or defense on which the nonmovant would have the burden of proof at trial. Tex R. Civ.
P. 166a(i); Jaimes v. Fiesta Mart, Inc., 21 S.W.3d 301, 303-04 (Tex. App.Houston [1st Dist.]
1999, pet. denied). Once the movant specifies the elements on which there is no evidence, the
burden shifts to the nonmovant to produce summary judgment evidence raising a genuine issue of
material fact on those elements. Tex. R. Civ. P. 166a(i); Trilogy, 143 S.W.3d at 459. A general
issue of material fact exists if more than a scintilla of evidence establishing the existence of the
challenged element is produced. Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex. 2004). 
More than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable
and fair-minded people to differ in their conclusions." Id. at 601. But when "the evidence offered
to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its
existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." Id.

 The central flaw undermining Bush's claims is the absence of evidence that either a
defect in the generator or the absence of a wait warning caused the fire and injuries. The only
evidence is that he did not spill gasoline, and that the tested generator did not reach temperatures that
caused or should have caused auto-ignition of vapors in open-air conditions. There is no evidence
that the absence of warning recommending a waiting period before refueling caused any injury or
that the presence of such a warning would have prevented Bush's injuries.


 Products liability: marketing defect

 Bush challenges the summary judgment against his marketing-defect theory of strict
products liability. Bush contended that the generator and motor were defective for failing to warn
of the need to allow the engine to cool for two minutes after shutoff before refueling. A marketing-defect cause of action consists of five elements: (1) a risk of harm that is inherent in the product or
that may arise from the intended or reasonably anticipated use of the product must exist, (2) the
product supplier must actually know or reasonably foresee the risk of harm at the time the product
is marketed, (3) the product must possess a marketing defect, (4) the absence of the warnings and/or
instructions must render the product unreasonably dangerous to the ultimate user or consumer of the
product, and (5) the failure to warn and/or instruct must constitute a causative nexus in the product
user's injury. Jaimes, 21 S.W.3d at 305-06.

 Bush did not present evidence of a causal link between any alleged failure to warn
and his injuries. Some of his experts affirmatively denied they were providing evidence of causation. 
Johnston testified that determining whether the lack of a warning caused the accident "would be pure
speculation." Johnston flatly stated, "I'm not giving any opinions about causation." Hasselbring and
Fowler also testified in their depositions that they were not there to speak to causation. More
important, there is no evidence that the generator and engine were unreasonably dangerous due to
the absence of a warning. Bush's experts did not provoke auto-ignition even when they poured
gasoline directly on the generator immediately after shut-off. Clayton, who testified regarding cause
and fire origin, noted that if the generator did not reach the auto-ignition temperature of gasoline,
then the generator would have to be ruled out as an ignition source. Without evidence that the
generator met or exceeded an acceptable auto-ignition temperature, Clayton provided no evidence
of causation. Because Bush did not produce more than a scintilla of evidence that the absence of a
warning caused his injuries, the district court properly granted summary judgment as to the
marketing defect claim.

 This failure obviates any harm from the court's alleged failure to consider evidence
from Coleman and Tecumseh employees about their awareness of the need for a cool-down period
at the time of marketing. Evidence that many employees were unaware of any need for a cool-down
period would not help Bush because it does not show the awareness needed to prove a marketing
defect. Although Coleman employee Kenneth Frank acknowledged that having a two-minute
warning would make the product better than having no warning, we need not resolve whether this
is relevant evidence because there is no evidence of causation.

 Bush also points to the fact that, although the 1989 Coleman generator used in this
case did not have a warning regarding refueling, the same model generator manufactured in 1995
included a warning label that reads "Gasoline is flammable. Allow engine to cool at least two
minutes before refueling." (5) But use of this warning on later models marketed by the appellees is not
evidence that the generator in this case was unreasonably dangerous without the warning, and, in the
absence of other evidence of causation, is no evidence that the lack of a warning on this generator
caused Bush's injuries.


 Negligence and gross negligence

 Bush did not support his allegation that Coleman and Tecumseh were negligent by
failing to provide adequate warnings and instructions regarding the hazards associated with the
foreseeable uses of the generator. To prevail in a negligence cause of action, a plaintiff must show
that (1) defendant owed plaintiff a duty, (2) defendant breached that duty, and (3) the breach
proximately caused plaintiff's injuries. Greater Houston Trans. Co. v. Phillips, 801 S.W.2d 523,
525 (Tex. 1990). As discussed above, Bush's experts were unable to show that the generator created
a hazard or danger during refueling. Without evidence that the gasoline vapors on this generator
would auto-ignite during refueling, Bush cannot prove that a warning was needed or that the absence
of a warning caused either the fire or his injuries. Summary judgment was proper against Bush's
negligence claims. (6)

 The failure of Bush's negligence claims forecloses his gross negligence claims. See
Trevino v. Lightning Laydown, Inc., 782 S.W.2d 946, 949 (Tex. App.--Austin 1990, writ denied)
("conduct cannot be grossly negligent without being negligent"); see also Tex. Civ. Prac. & Rem.
Code § 41.001(11) (West Supp. 2004) (defining gross negligence).


CONCLUSION


 We hold that the district court did not abuse its discretion in excluding the expert
testimony of Bush's expert witnesses Lori Hasselbring, Joe Fowler, Waymon Johnston and Judd
Clayton. In addition, we conclude that the district court did not err in granting summary judgment
in favor of Coleman and Tecumseh on all claims that are the subject of this appeal. Accordingly,
we affirm the judgment of the district court.


 __________________________________________

 Bob Pemberton, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed: May 26, 2005
1. Dwight Pfennig has three degrees: a bachelor's in petroleum engineering and master's and
doctor's in chemical engineering. His work focuses on potential fires and explosions from chemicals
and hot equipment. 
2. The district court said it did not exclude Beaver's testimony because Beaver did not offer 
an opinion regarding causation.
3. The temperature reached 756ºF in another test, but the engine ran out of gasoline before
the testers could spill gasoline on it. Appellees' expert Pfennig said the generator reached 891ºF in
one of his tests, but did not approach the open-air auto-ignition temperature of gasoline of 1155ºF,
and still did not cause auto-ignition of gasoline vapors.
4. Bush attempted to file an additional expert report after summary judgment when the
discovery deadline, the evidence-filing deadline, and the Robinson hearing all had passed. Late-filed
evidence is not part of the summary-judgment record unless the district court granted leave to file
it. See Tex. R. App. P. 166a(c); see also Benchmark Bank v. Crowder, 919 S.W.2d 657, 663 (Tex.
1996); Basin Credit Consultants, Inc. v. Obregon, 2 S.W.3d 372, 374 (Tex. App.San Antonio
1999, pet. denied). Finding no indication that the district court granted such leave, we cannot
consider this evidence on appeal.
5. Evidence of subsequent remedial measures currently is not admissible to prove negligence,
culpable conduct, a defect in the product, a defect in the product's design, or a need for a warning
or instruction. Tex. R. Evid. 407(a). When this case was filed, however, subsequent remedial
measures were admissible in strict products liability cases.
6. Bush appears to have abandoned his claim for negligent design. Even if he did not,
summary judgment against the claim was proper because no evidence of a reasonable alternative
design was admitted into the record. See American Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420,
437 (Tex. 1997).