# NO. 12-23-00289-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| ***ROBERT A. ADAMS, III, APPELLANT*** | *§* | *APPEAL FROM THE 273RD* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| ***CITY OF PINELAND, APPELLEE*** | *§* | *SABINE COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Robert A. Adams III appeals the trial court's order denying his traditional motion for summary judgment and granting Appellee City of Pineland's (the City) traditional motion for summary judgment. Adams raises five issues on appeal. We affirm.

## BACKGROUND

Michael Adams[1] began working on a probationary basis as a patrol officer for the City of Pineland Police Department (the Department or P.P.D.) on May 22, 2020. The Department's written job description for the patrol officer position states, "Under general direction of the Police Chief, the Police Officer will patrol assigned areas to deter crime and ensure the safety of the

---

[1] On December 5, 2022, after the parties completed discovery, Michael Adams passed away. On February 21, 2023, the trial court signed an order substituting his father, Robert A. Adams III, as Plaintiff in this case. For ease of reference, we continue to refer to Michael Adams and Robert Adams as "Adams" unless greater specificity is required for clarity's sake.

community; respond to calls and complaints, taking appropriate action." Bradley Turner was the Police Chief for PPD who interviewed and hired Adams.

The City's written policies and procedures set forth that every person initially appointed to city service shall be required successfully to complete a three-month probationary period. It further states, however, that an employee's probationary period may be extended up to three additional months if, in the opinion of the department head or mayor, such additional time is necessary or warranted to adequately evaluate the employee. Turner testified that he did not attempt to extend the probationary period because he believed it was six months.

When Adams was hired, he was required to take a drug test before he could begin his probationary employment with PPD. At this time, Adams informed Turner that he suffered from pancreatitis, which caused him a great deal of pain and required that he take Percocet—a combination of oxycodone and acetaminophen—for pain relief. Adams assured Turner that he took the pain medication at night to help him sleep and never took it while on duty, despite his having been cleared by his doctor to do so.

Adams began treatment for acute, recurrent pancreatitis beginning in 2015. From November 2015 until he gave his deposition testimony in April 2022, Adams estimated that he visited a hospital thirteen or fourteen times in response to a "flare-up" of this condition. Adams was treated by Gastroenterologist Kalpesh Patel, M.D. and Neurologist Everton Edmondson, who also has a sub-specialization in pain medicine, and was prescribed Percocet to be taken every four hours as needed, along with a fentanyl patch, which he was unable to wear with a bullet proof vest and heavy clothing, and, therefore, which he removed while at work.

On August 3, Turner met with Adams to ask why he was not conducting more traffic stops.[2] According to Adams, he never previously was given a quota for the number of stops he should conduct. Adams responded that, on some occasions, when he wasn't feeling well due to his pancreatitis, he would not be able to be "as active" as he could on other days. Turner responded that in such a case, he did not have a problem and would not fire Adams over a medical condition.

Adams stated that Turner told him that for simple, vehicular infractions, he could give a

---

[2] The later-compiled data to which it is apparent Turner then had access indicates that from May 22, 2020, until September 11, Adams made seventy-seven traffic stops, issued forty written warnings, and issued thirty-seven citations. By comparison, fellow officer Todd Zengerle, during his first 100 days with PDD, made186 traffic stops, issued 113 warnings, and issued seventy-three citations. Turner, in addition to his duties as Police Chief, during the 152-day period from May 1, 2020, to September 30, made 100 traffic stops.

motorist a verbal warning, which Adams did on many occasions. Turner confirmed that there are circumstances when, in an officer's discretion, he could issue a verbal warning in lieu of a traffic citation. However, in Turner's opinion, warnings needed to be in-writing to keep a record for racial-profiling purposes. Ultimately, the meeting concluded with Turner's instructing Adams to give motorists written warnings instead of verbal warnings.

Following his meeting with Turner, Adams continued performing his duties as a patrol officer. Soon after that meeting, Turner had P.P.D. Officer Todd Zengerle conduct a "ride around" with Adams to observe his performance. Because they worked opposite shifts, this was the first time Zengerle and Adams worked a full, patrol shift together. Zengerle reported that during the night of the ride-around, Adams parked on the side of Highway 96, a common place to conduct speed and traffic enforcement. Zengerle stated that he would identify cars that were speeding and tell Adams they should pull them over, but Adams just wanted to stay in the car. According to Zengerle, Adams mostly let speeding vehicles pass without initiating a stop and, instead, sat in the parked car and scrolled through his phone for most of the shift, even falling asleep at one point. Zengerle described Adams's behavior during the shift as "out of it" and observed that he did not exhibit the alertness Zengerle expected from a law-enforcement officer while on active duty. Zengerle testified that he kept trying to get Adams to drive around and patrol or, at least, make an effort to stop speeding cars, but Adams preferred to stay parked. Zengerle stated that they stopped one or two cars that night and could have stopped several more if Adams took the initiative to make stops. Zengerle also recalled Adams's making the comment, "if you feel like you ever need to go back to the office to pass out you go do what you need to do[.]" Adams mentioned to Zengerle that he had medical conditions, which Zengerle interpreted as his making an excuse for his lazy behavior, sleeping, and lack of initiative. After the shift, Zengerle reported his observations to Turner.

On September 9, Turner joined Adams on patrol to observe his performance. On September 11, Turner terminated Adams's employment as a patrol officer. In a written statement executed on October 1, in which he memorialized Adams's termination, Turner described his observations during the ride-along with Adams as follows:

> Later in the shift after an intense situation with a suspect we were driving back to the P.D. and Officer Adams mentioned that he was in a lot of pain and may need to go to the hospital. I advised him to go to the hospital, but he refused until he was done with his shift. Chief Turner observed Officer Adams to be in extreme pain while typing a report. He left from the P.D. and took his report

to the Sheriff's Office where EMS came over and checked him out. Upon this second instance of his pain and not being able to perform his duties adequately, it was determined by me, Bradley Turner[,] Chief of Police, that I needed to terminate his employment based on the fact he physically could not perform his duties and would not want Mr. Adams himself or anyone else to be put in an unfortunate situation due to his inability to perform his duties.

In an Employee Performance Evaluation dated September 11, Turner wrote that Adams was "unable to perform duties at the level expected by the Department. Terminated 9/11/20."

On October 27, Adams sent a letter to Turner seeking reinstatement, to which he attached a copy of a letter dated October 16, 2020, from Patel, in which Patel indicated that Adams was fit for duty. Turner filed the letter and refused to reinstate him.

On January 19, 2021, Newton County Sheriff's Department Sergeant James Hopson contacted P.P.D. in conjunction with its background check on Adams. Turner spoke with Hopson about Adams, and related to him that Adams is a "great guy and did him a good job." He continued, stating, "the only thing that worried him about Adams was his medical" but that he would be "re[-]hireable with the agency if he got his medical figured out and taken care of." Turner further stated that Adams never got in trouble or had any write-up with his agency.[3]

On September 20, 2021, Adams filed the instant suit, in which he alleged damages due to "regarded-as" disability discrimination under the Texas Commission on Human Rights Act.[4] Adams filed his traditional motion for summary judgment on June 20, 2023; the City filed its traditional motion for summary judgment on August 1. Each party filed responses, and the trial court conducted a hearing on the motions on August 22. On October 11, the trial court granted the City's motion for summary judgment and denied Adams's motion. The trial court rendered a final judgment in the City's favor on November 13, and this appeal followed.

## SUMMARY JUDGMENT

In his first and third issues, Adams argues that the trial court erred in granting the City's motion for summary judgment and denying his motion because the summary judgment evidence supports a prima facie case that he was qualified for his position as a police officer and the City terminated him because it regarded him as disabled.

---

[3] The exhibit containing the evidence of the exchange between Hopson and Turner was excluded from the summary judgment record over Adams's objection.

[4] *See* TEX. LAB. CODE ANN. § 21.051 (West 2021).

**Standard of Review**

Because summary judgment is a question of law, a trial court's summary judgment decision is reviewed de novo.[5] *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); ***Provident Life & Accident Ins. Co. v. Knott***, 128 S.W.3d 211, 215 (Tex. 2003); ***McMahon Contracting, L.P. v. City of Carrollton***, 277 S.W.3d 458, 467–68 (Tex. App.–Dallas 2009, pet. denied). When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review the summary judgment evidence presented by both sides and determine all questions presented and render the judgment the trial court should have rendered. *See **Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding***, 289 S.W.3d 844, 848 (Tex. 2009). The reviewing court must affirm summary judgment if any of the summary judgment grounds are meritorious. ***Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.***, 136 S.W.3d 643, 648 (Tex. 2004). To prevail on a summary judgment motion brought under Rule 166a(c), a movant must show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); ***Little v. Tex. Dep't of Criminal Justice***, 148 S.W.3d 374, 381(Tex. 2004). A defendant "who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim." ***IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason***, 143 S.W.3d 794, 798 (Tex. 2004) (citing ***Sw. Elec. Power Co. v. Grant***, 73 S.W.3d 211, 215 (Tex. 2002)). A plaintiff moving for summary judgment must conclusively prove all essential elements of its claim. *See* TEX. R. CIV. P. 166a(a), (c); ***MMP, Ltd. v. Jones***, 710 S.W.2d 59, 60 (Tex. 1986); ***Roberts v. Clark***, 188 S.W.3d 204, 209 (Tex. App.–Tyler 2002, pet. denied).

"When reviewing a summary judgment, we take as true all competent evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." ***Diversicare Gen. Partner, Inc. v. Rubio***, 185 S.W.3d 842, 846 (Tex. 2005). We are not required to ascertain the credibility of affiants or to determine the weight of evidence in the affidavits, depositions, exhibits, and other summary judgment proof. *See **Gulbenkian v. Penn***, 252 S.W.2d 929, 932 (Tex. 1952); ***Palestine Herald-Press Co. v. Zimmer***, 257 S.W.3d 504, 508 (Tex. App.–Tyler 2008, pet. denied). If the movant establishes a right to summary judgment,

---

[5] In conducting a de novo review, the trial court's reasoning is not relevant to or controlling of our review and analysis. *See **Markel Ins. Co. v. Muzyka***, 293 S.W.3d 380, 385 (Tex. App.–Fort Worth 2009, no pet.).

the burden shifts to the nonmovant to raise a material fact issue sufficient to defeat summary judgment. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

Further, all theories in support of or in opposition to a motion for summary judgment must be presented in writing to the trial court. *See* Tex. R. Civ. P. 166a(c). If the trial court's order granting summary judgment does not specify the grounds relied on for its ruling, we will affirm it if any of the theories advanced are meritorious. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993).

## Governing Law

To prevail on a disability discrimination claim, a plaintiff must show that (1) he has a "disability," (2) he is "qualified" for the job he seeks, and (3) he suffered an adverse employment decision because of his disability. *See El Paso Cty. v. Vasquez*, 508 S.W.3d 626, 639 (Tex. App.– El Paso 2016, pet. denied). A disability is defined as "a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having such an impairment." Tex. Lab. Code Ann. § 21.002(6) (West 2021). Courts interpret a "major life activity" as the equivalent of "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Union Carbide Corp. v. Mayfield*, 66 S.W.3d 354, 360 (Tex. App.–Corpus Christi 2001, pet. denied). Discrimination because of or on the basis of disability applies only to discrimination because or on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform a job. *See* Tex. Lab. Code Ann. § 21.105 (West 2021).

There are two alternative methods of proof in discriminatory treatment cases. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476–77 (Tex. 2001) (adopting U.S. Supreme Court's alternative analyses for employment discrimination cases); *Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 433 (Tex. App.–Houston [1st Dist.] 2016, pet. denied). An employee may prove discrimination by presenting the trial court with direct evidence, which requires the court to employ a "mixed-motive" analysis. *See Donaldson*, 495 S.W.3d at 433. "Direct evidence of discrimination is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 653 (Tex. App.–Dallas 2012, no pet.). That is, if the employee produces direct evidence that discriminatory animus played a role in the decision at issue, the burden of persuasion shifts to the

6

employer, who must prove that it would have taken the same action regardless of discriminatory animus. *Id.* "If an inference is required for the evidence to be probative as to the employer's discriminatory animus in making the [adverse] employment decision, the evidence is circumstantial, not direct." *Id.* at 653–54. For workplace comments to provide sufficient evidence of discrimination, the remarks must be (1) related to the protected class, (2) proximate in time to the adverse employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue. *Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802, 821 (Tex. App.–Houston [1st Dist.] 2012, pet. denied). However, because direct evidence of discrimination is rare in employment cases, claimants often must rely on indirect or circumstantial evidence of discrimination. *Metro. Transit Auth. of Harris Cty. v. Douglas*, 651 S.W.3d 122, 127 (Tex. App.–Houston [14th Dist.] 2021, no pet.).

Where only circumstantial evidence is available, courts utilize the burden-shifting paradigm established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S. Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff first must establish a prima facie case of discrimination. *Id.* 411 U.S. at 802, 93 S. Ct. at 1824. Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. *Donaldson*, 495 S.W.3d at 433. Under the *McDonnell-Douglas* test, the employee's ultimate goal is to show that the employer's stated reason for its adverse action against the employee was a pretext for discrimination by presenting the trial court with indirect or inferential evidence. *See id.* at 433–34.

### Adams's Proof of a Prima Facie Case of Disability Discrimination by the City

Adams argues that the summary judgment evidence conclusively demonstrates a prima facie case that he was qualified for his position as a police officer and the City terminated him because it regarded him as disabled.[6]

A qualified, disabled person is one with a disability who, with or without reasonable accommodations, can perform the essential functions of the employment position that such

---

[6] Adams contends that he was "regarded as" disabled. Under Chapter 21, an individual need not have an actual physical impairment to state a claim, as long as that individual is "regarded as having such an impairment." TEX. LAB. CODE ANN. § 21.002(6) (West 2021); *see also El Paso Cty. v. Vasquez*, 508 S.W.3d 626, 637 (Tex. App.–El Paso 2016, pet. denied). An individual is covered by the "regarded as" prong of the definition of disability in the Act if he "has none of the impairments defined in [the definition of the term 'impairment'] but is treated by a covered entity as having a substantially limiting impairment. *Vasquez*, 508 S.W.3d at 637. Here, we assume arguendo that Turner regarded Adams as disabled due to his pancreatitis.

7

individual holds or desires. *See **LeBlanc v. Lamar State Coll.***, 232 S.W.3d 294, 299 (Tex. App.–Beaumont 2007, no pet.).[7] Under the circumstances of this case, to demonstrate that he is a "qualified employee," Adams had to prove that he could perform the essential functions of the job in spite of his disability. *See **Hagood v. Cty. of El Paso***, 408 S.W.3d 515, 525 (Tex. App.–El Paso 2013, no pet.). A function is "essential" if it bears more than a marginal relationship to the employee's job. *See **Tex. Dep't of Family & Protective Servs. v. Howard***, 429 S.W.3d 782, 790 (Tex. App.–Dallas 2014, pet. denied). The non-exclusive factors that assist in determining whether a job function is essential include: (1) the employer's judgment about whether the function is an essential one, (2) written job descriptions, (3) the amount of time that the employee spends performing the function, (4) the consequences of allowing the employee not to perform the function, and (5) work experience of persons holding the position. ***LeBlanc.***, 232 S.W.3d at 300 n.3.

As Adams stresses in his brief, Turner emphatically stated in his deposition testimony that he concluded that Adams suffered from a physical impairment that rendered him unable to perform the essential functions of his job. The City's job description for police officer position stated, "[u]nder general direction of the Police Chief, the Police Officer will patrol assigned areas to deter crime and ensure the safety of the community; respond to calls and complaints, [and take] appropriate action." In his deposition, Turner described the duties and responsibilities of the patrol officer position as enforcing traffic laws, patrolling, answering calls, taking reports, and being seen in the community. Turner further described the P.P.D. as a proactive agency and stated that he wanted patrol officers who would "highly enforce" traffic laws, as opposed to sitting in one spot or waiting at the office for a call to come in, and who would be seen in the community.

In its brief, the City first points out that the traffic stop data, to which Turner had access[8] at the time of his August 3 meeting with Adams, demonstrates that, up until that time, Adams issued far fewer citations than the other two officers in the department. The evidence reflects that during this meeting, when Turner addressed this matter with him, Adams explained to Turner that

---

[7] Here, Adams argues that he was qualified for his police-officer position without the need of any reasonable accommodations.

[8] Adams argues that this citation data was compiled after his termination and, thus, is not relevant to the reasoning underlying Turner's decision. However, while the data in the record may have been compiled after Adams's termination, the record reflects that Turner had access to the information at the time of the meeting and discussed that information with Adams. At the least, the later-compiled information corroborates Turner's statements to Adams about the disparity between the citations he issued versus those Zengerle issued.

the pain caused by his pancreatitis resulted in his being less active on certain days. He elaborated that his pain made it difficult for him to run traffic, drive around, and get in and out of the patrol vehicle. He also told Turner that a portion of his encounters resulted in verbal warnings to drivers, rather than written warnings or citations.

The City further contends that both Turner and Zengerle observed Adams's performance during their respective times spent on patrol with him during the period leading up to his termination. Zengerle observed that Adams sat parked on the shoulder of the highway for most of his shift rather than actively patrolling. According to Zengerle, Adams was not initiating traffic stops, even when he observed cars violating traffic laws. Zengerle further observed that Adams scrolled through his phone for most of the shift, seemed out of it, and did not exhibit the alertness Zengerle expected from a law enforcement officer on active duty. Zengerle also observed Adams sleeping while on duty. Zengerle stated that Adams only stopped one or two cars that night but could have stopped more had he taken the initiative to make the stops. According to Zengerle, Adams told him, "[I]f you feel like you ever need to go back to the office to pass out you go do what you need to do." Thereafter, Turner observed Adams experiencing significant pain while he responded to a call about an "intense situation" with a suspect. Turner further observed that Adams was unable to complete his incident report when they returned to the station. Instead, according to Turner, Adams took the report with him to the Sabine County Sheriff's Office where he was checked out by EMS. Turner concluded that due to the pain Adams experienced just driving to the location of the pursuit and filling out the report, there was "no way he could have physically pursued and apprehended a suspect himself had the situation required it."

In his brief, Adams seeks to explain the discrepancy of his traffic-stop records as compared to Zengerle's and Turner's. In so doing, he points out that prior to his meeting with Turner where Turner clarified his expectations with regard to warnings' being made in writing, Adams made many stops, which resulted in his giving verbal warnings for minor offenses at his discretion.[9] He states that he gave many such verbal warnings, which explains the discrepancy in the number of stops he conducted versus the number of stops conducted by Zengerle. But even given Adams's statement that he issued verbal warnings, the number of which is impossible to discern, such

---

[9] *But see* TEX. CODE CRIM. PROC. ANN. art. 2.133(b)(8) (West Supp. 2023) (peace officer who stops motor vehicle for alleged violation shall report to law enforcement agency that employs officer information, including whether officer issued verbal or written warning or ticket or citation as result of stop).

evidence does not serve to contradict the eyewitness testimony from both Turner and Zengerle of specific instances in which Adams either was unable or unwilling to perform the essential functions of his job, including initiating traffic stops where he observed the driver violate the law.

Based on our review of the summary judgment record, it is apparent that Adams's summary judgment evidence that he issued many nonverbal warnings before being told to issue written warnings, taken as true, still amounts only to an indefinite account of his overall ability to perform all of his essential duties during the time in question. The summary judgment evidence leaves no doubt that Turner had access to the information at the time of the meeting and any subsequently-compiled data serves to corroborate what he related to Adams: that he was not issuing a comparable number of traffic citations compared to other officers on the small police force. Furthermore, Adams focuses on this data heavily in support of his contention that he was qualified. But he fails to rebut the first-hand observations of Turner and Zengerle that he failed to actively patrol the area, declined to initiate traffic stops on numerous cars which violated traffic laws, spent most of the shift scrolling through his phone, slept while on duty, and experienced such a degree of pain when performing his duties that he was unable to complete other essential functions such as filling out a report at the end of his shift.[10] Finally, he fails to rebut Turner's statement that, in Adams's own words, on some days he simply could not perform his duties as a result of his condition. Instead, he notes that at the time of his termination, Turner told him he was a "good worker," that did nothing wrong, and he was terminated because of "the medical stuff."[11] However, when this stated reason for his termination is considered in conjunction with the body of summary judgment evidence, Turner's statement only can be interpreted as "the medical stuff[,]" which interfered with Adams's ability consistently to perform the essential duties of his patrol-officer position.

---

[10] Adams's analysis focuses on the City's job description and less so on Turner's testimony about what he considered to be the essential functions of the patrol officer position. *See LeBlanc v. Lamar State Coll.*, 232 S.W.3d 294, 300 n.3 (Tex. App.–Beaumont 2007, no pet.).

[11] Adams contends that Turner's deposition testimony that Adams was "eligible for rehire" demonstrates that he was not terminated for just cause. Adams bases this argument on the reemployment provisions of the Pineland Personnel Policies, which states that only employees who have not been terminated for just cause are eligible for rehire. However, Turner's deposition testimony upon which Adams relies amounts to an isolated statement. Adams did not follow up this question with any interrogation about the aforementioned, reemployment provisions, about what type of position for which Adams may have been eligible, nor did he otherwise attempt to elicit from Turner that he was aware of this City policy since he had not been the PPD Police Chief for some time. We conclude that Turner's isolated testimony, without more, does not demonstrate that Adams was not terminated for just cause.

Indeed, in his deposition, Turner testified that he concluded, based on Adams's physical impairment, i.e., pain, that he was unable to perform the essential functions of his job.[12]

Based on the foregoing, we conclude that the summary judgment evidence conclusively proves as a matter of law that Adams was unable consistently to perform the essential functions of the patrol-officer position he held. As a result, Adams failed to offer proof that he was a "qualified employee" and, thus, failed to offer prima facie proof in support of this element of his discrimination claim. Moreover, we reiterate that discrimination based on a disability applies only to discrimination due to a condition that does *not* impair an individual's ability to reasonably perform his job. *See* TEX. LAB. CODE ANN. § 21.105. Accordingly, we further conclude that to the extent Turner's decision to terminate Adams's employment was based on his pancreatitis, because the summary judgment evidence demonstrates that such condition impaired Adams's ability reasonably and consistently to perform his job, Turner's decision was not subject to a discrimination claim under Section 21.051. *See id.* Therefore, we hold that the trial court did not err in granting the City's motion for summary judgment and denying Adams's motion. Adams's first and third issues are overruled.[13]

### RULINGS ON ADMISSIBILITY OF SUMMARY JUDGMENT EVIDENCE

In his fifth issue, Adams argues that the trial court abused its discretion in sustaining the City's objection to a portion of his summary judgment evidence and overruling his objections to portions of the City's summary judgment evidence.

**Standard of Review and Governing Law**

We review the trial court's ruling on the admissibility of evidence for an abuse of discretion. *Gharda USA, Inc. v. Control Sols.*, Inc., 464 S.W.3d 338, 347 (Tex. 2015). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

Summary-judgment evidence must be presented in a form that would be admissible at trial. *In Estate of Guerrero*, 465 S.W.3d 693, 706 (Tex. App.–Houston [14th Dist.] 2015, pet. denied).

---

[12] In his affidavit, Turner states that his decision to terminate Adams was based on multiple instances of Adams's being unable or unwilling to perform the essential functions of his job, Adams's own statements about his ability consistently to perform his duties, his lack of willingness to patrol, and his traffic-stop numbers.

[13] As a result of our disposition of Adams's first and third issues, we do not consider his second and fourth issues. *See* TEX. R. APP. P. 47.1.

That is, the same evidentiary standards that apply in trials also control the admissibility of evidence in summary-judgment proceedings. *See FieldTurf USA, Inc. v. Pleasant Grove Indep. Sch. Dist.*, 642 S.W.3d 829, 837 (Tex. 2022).

If a trial court abuses its discretion and erroneously admits or excludes evidence, then the question is whether the error "probably caused the rendition of an improper judgment." TEX. R. APP. P. 61.1(a); *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018); *Alicea v. Curie Bldg., L.L.C.*, 632 S.W.3d 142, 148 (Tex. App.–El Paso 2021, no pet.). That standard does not require the complaining party to prove that but for the trial court's evidentiary ruling, a different judgment necessarily would have resulted. *See State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). Rather, if erroneously admitted or excluded evidence was "crucial to a key issue," then the error was likely harmful—that is, it probably caused the rendition of an improper judgment—unless the evidence was cumulative or the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *See id.*; *Alicea*, 632 S.W.3d at 148.

**Exclusion of Adams's Summary Judgment Evidence**

Adams first argues that the trial court abused its discretion in sustaining the City's hearsay objection and excluding Exhibit 8, which consists of the supplemental records from the Newton County Sheriff's Office, containing business records of the sheriff's department and Hopson's record of the background check conducted with Turner. But even assuming arguendo that the trial court abused its discretion in sustaining the City's objection to this evidence, the outcome would not differ.

Adams argues that the trial court's ruling probably caused the rendition of an improper judgment because "the excluded evidence was crucial to the key issue [of] whether the [C]ity would not have fired Adams in the absence of discriminatory animus." However, as set forth in our analysis of Adams's first and third issues, the summary judgment evidence conclusively proves as a matter of law that Adams was unable consistently to perform the essential functions of the patrol-officer position he held, and as a result, Adams failed to offer proof that he was a "qualified employee," thus, he failed to offer prima facie proof in support of this element of his discrimination claim. Because Adams failed to offer prima facie proof of his discrimination claim, the burden never shifted to the City under either a mixed-motive analysis or, otherwise, under the *McDonnnel Douglas* burden-shifting paradigm. *See Jespersen*, 390 S.W.3d at 653; *see also McDonnell*

***Douglas Corp.***, 411 U.S. at 802–05, 93 S. Ct. at 1824–26. Accordingly, we hold that this allegedly, erroneously-excluded evidence was not crucial to a key issue, was not harmful, and, thus, did not cause the rendition of an improper judgment. *See **Cent. Expressway Sign Assocs.***, 302 S.W.3d at 870.

## Admission of the City's Summary Judgment Evidence

Adams further argues that the trial court abused its discretion in overruling his objections to three sections of Turner's affidavit. His first objection pertains to the following statement in Turner's affidavit related to the duration of his probationary status:

> As allowed by the policy, all of my new hires were on 6 month probationary periods, including Mr. Adams. I always felt that a longer time period than 3 months was necessary to properly evaluate my officers. Because I was the department head, according to the written policy, it was entirely my discretion on whether the probationary period was 3 months or 6 months, and there was no requirement that an employee be informed that the probationary period was being extended from 3 to 6 months, or that such extension could not be automatically made at the beginning of the probationary period by the department head.

Adams contends that Turner's statement that the duration of the probationary period was entirely under his discretion is conclusory and is an attempt unilaterally and illegally to change the City's written personnel policies, which reserves this power to the City.

However, as set forth above, in our analysis of Adams's first and third issues, we determined that the summary judgment evidence conclusively proves as a matter of law that Adams failed to offer proof that he was a "qualified employee" and, thus, failed to offer prima facie proof in support of this element of his discrimination claim. Whether Adams remained on probationary status at the time of his termination played no part in this analysis.[14] Accordingly, we conclude that this allegedly, erroneously-admitted evidence was not crucial to a key issue, was not harmful, and, thus, did not cause the rendition of an improper judgment. *See **Alicea***, 632 S.W.3d at 148.

Adams's next objection pertains to the following statement in Turner's affidavit related to the underlying reasons for his decision to terminate Adams's employment:

---

[14] In conjunction with his second issue, Adams argues that even had he remained on probationary status at the time of his termination, there is no Texas authority permitting an employer to use probation as a shield against liability for disability discrimination. This court similarly is not aware of any Texas authority which supports such a proposition.

> Based on multiple instances of Adams['s] being either unable or unwilling to perform the essential functions required of a patrol officer, Adams['s] own statements admitting that he did not have the desire or the ability to actively perform the functions of his job, Adams['s] demonstrating a lack of willingness to actively patrol, as evidenced by Todd Zengerle's observations during the ride around and Adams'[s] traffic stop numbers, and the safety risk that his unwillingness or inability to perform such functions posed to himself and members of the public, I made the decision that Adams could not continue his employment as a patrol officer with the City of Pineland. Adams was separated from employment within the six month probationary period I had in place for new law enforcement hires.

Adams contends that Turner's statements, which are based on Adams's statements and Zengerle's observations, constitute hearsay. He further argues, as before, that Turner's statement about the six-month probationary period is conclusory.

With regard to Adams's hearsay contentions, we first note that any statement in Turner's affidavit attributable to Adams is a statement by a party opponent and is, therefore, not hearsay. *See* TEX. R. EVID. 801(e)(2)(A). Turning to Appellant's contentions about Zengerle's statements, the section of Turner's affidavit to which Appellant directs this court on appeal refers generally to Zengerle's observations during the ride-around but does not set forth any statements made by Zengerle which might constitute hearsay. *See* TEX. R. EVID. 801(d) ("Hearsay" means "a statement . . . a party offers in evidence to prove the truth of the matter asserted"). Furthermore, Turner's affidavit contains a more specific account of Zengerle's observations during the ride-around, but Adams does not challenge that section of Turner's affidavit in his brief on appeal. *See* TEX. R. APP. P. 38.1(i); ***El Paso Indep. Sch. Dist. v. Portillo***, 661 S.W.3d 512, 539 (Tex. App.–El Paso 2023, pet. denied) (citing ***Thornhill v. Ronnie's I-45 Truck Stop, Inc.***, 944 S.W.2d 780, 793 (Tex. App.–Beaumont 1997, writ vacated)) (any error in admitting witness's testimony was harmless where testimony merely was cumulative of other evidence, the admission of which appellant did not challenge on appeal). Lastly, because we have held that the allegedly, erroneously-admitted evidence regarding the duration of Adams's probationary period was not crucial to a key issue, was not harmful, and, thus, did not cause the rendition of an improper judgment, we also conclude that the admission of the aforementioned section of Turner's affidavit on that same basis likewise was not harmful. *See **Alicea***, 632 S.W.3d at 148.

Adams's next objection pertains to the following statement in Turner's affidavit related to the role Adams's use of fentanyl patches and his failure to disclose other serious medical conditions apart from his pancreatitis played in Turner's decision to terminate Adams's employment:

> Had I known Adams was using fentanyl patches in combination with the oxycodone he was taking, and that he had other serious medical conditions aside from his pancreatitis, namely congenitive heart failure, I would have required a medical evaluation and/or temporarily relieved Mr. Adams from his duties, as I do not now believe that it was safe for someone with those serious conditions and using those medications to be driving around in a patrol vehicle and responding to emergencies, and potentially life threatening situations where the use of deadly force and/or driving vehicles at high speeds during a pursuit may come into play. I did not terminate Adams because he had a serious medical condition.

Adams contends that the trial court abused its discretion in admitting these statements because the first sentence is based on speculation of what Turner would have done had he known certain information. He further contends that the trial court abused its discretion in admitting the second sentence because it amounts to a mixed legal/factual conclusion and controverts his sworn deposition testimony.

With regard to Adams's first objection, even assuming arguendo that Turner's statement about what he would have done had he known certain information was inadmissible, the outcome would not change. As noted previously, based on our analysis of Adams's first and third issues, we held that Adams failed to offer proof that he was a "qualified employee" and, thus, failed to offer prima facie proof in support of this element of his discrimination claim. Adams alleged use of fentanyl patches while on duty or other purportedly-undisclosed health conditions apart from his pancreatitis played no part in this analysis. Accordingly, we hold that this allegedly, erroneously-admitted evidence was not crucial to a key issue, was not harmful, and, thus, did not cause the rendition of an improper judgment. *See Alicea*, 632 S.W.3d at 148.

Turning our analysis to Adams's objections to the second sentence in this section, we disagree with his assertion that Turner's statement about why he did not terminate Adams's employment amounts to a legal or factual conclusion. In the next sentence, to which Adams does not object, Turner testified that he terminated Adams because "he either would not or could not perform the essential functions of his job after having over 5 months to prove to me that he could, and his inability to perform the essential functions of his job[.]" The statement to which Appellant objects, when considered in conjunction with the sentence which follows it, simply amounts to a factual statement, which serves to explain that the subsequently-stated reason for Adams's termination was the sole reason for that decision.

Adams further objects that this statement should not have been admitted because it is inconsistent with Turner's deposition testimony. In his deposition, Turner testified that he

terminated Adams because the pain resulting from his physical impairment rendered him unable to perform the essential functions of his job. Adams does not seek to explain how Turner's deposition testimony is inconsistent. Nevertheless, even had the trial court agreed with Adams and excluded this statement, the outcome would not differ. As set forth previously, discrimination based on a disability applies only to discrimination due to a condition that does *not* impair an individual's ability to reasonably perform his job. *See* TEX. LAB. CODE ANN. § 21.105. Accordingly, even if Turner's statement that he did not terminate Adams due to a serious medical condition was omitted and only his deposition testimony was considered, our disposition of his first issue would remain unchanged because the summary judgment evidence demonstrates that Adams's condition impaired his ability reasonably and consistently to perform his job and, thus, Turner's decision was not subject to a discrimination claim under Section 21.051. *See id.*

In sum, we hold that the trial court did not abuse its discretion by sustaining the City's objection to his Exhibit 8 or by its overruling his several objections to three, specific portions of Turner's affidavit. Adams's fifth issue is overruled.

## DISPOSITION

Having overruled Adams's first, third, and fifth issues, we ***affirm*** the trial court's judgment.

JAMES T. WORTHEN
Chief Justice

Opinion delivered May 8, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

16



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MAY 8, 2024**

**NO. 12-23-00289-CV**

**ROBERT A. ADAMS, III,**
Appellant
V.
**CITY OF PINELAND,**
Appellee

Appeal from the 273rd District Court
of Sabine County, Texas (Tr.Ct.No. CV2113986)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED, and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the appellant, **Robert A. Adams, III** for which execution may issue and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*